# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                                                    No. 1:17-cr-00370-JCH

IMAD AYSHEH, *also known as*
IMAD MANASSRA, IYAD AYSHEH,
NEDAL AYSHEH, RAED AYSHEH and
NAEL ALI,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the Government's Notice of Intent to Offer Co-Conspirator Statements (ECF No. 169) in which the Government disclosed summaries of groups of statements that it intends to admit at trial as non-hearsay under Fed. R. Evid. 801(d)(2)(E).[1] The Court held a hearing on the motion on October 5, 2021 pursuant to *United States v. James*, 590 F.2d 575 (5th Cir. 1979). The Court, having considered the motion, evidence, applicable law, and pre- and post-*James* hearing briefs, makes the following findings of fact and conclusions of law regarding the admissibility of the coconspirator statements.

## I.    LEGAL STANDARDS

Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1)-(2). "But testimony not offered to prove the matter asserted that is 'offered instead for *relevant* context or background' is not hearsay." *United States v. Becknell*, 601 F. App'x 709, 712 (10th Cir. 2015) (unpublished opinion) (quoting *United States*

---

[1] Although filed as a notice, the Court construes the Government's notice as a motion for pretrial rulings on the admissibility of evidence proffered under Fed. R. Evid. 801(d)(2)(E).

*v. Hinson*, 585 F.3d 1328, 1336 (10th Cir. 2009)). Questions and comments do not constitute hearsay if they are not offered to prove the truth of the matter but are offered to show their effect on the other person in the conversation and provide context. *See United States v. Smalls*, 605 F.3d 765, 785 n. 18 (10th Cir. 2010).

Although hearsay statements are generally not admissible at trial, *see* Fed. R. Evid. 802, a statement that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay, and therefore may be admissible as substantive evidence against the party, Fed. R. Evid. 801(d)(2)(E). For a statement to be non-hearsay under Rule 801(d)(2)(E), the district court must first find the following elements by a preponderance of the evidence: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy. *United States v. Rutland*, 705 F.3d 1238, 1248 (10th Cir. 2013).

The elements of conspiracy, in turn, are: (1) there was an agreement to violate the law; (2) the declarant knew the essential objectives of the conspiracy; (3) the declarant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. *Id.* at 1249 (citing *United States v. Ailsworth*, 138 F.3d 843, 850-51 (10th Cir. 1998)). The government, as the proponent of the evidence, has the burden of proving the relevant preliminary facts. *United States v. Perez*, 989 F.2d 1574, 1580 (10th Cir. 1993).

The government does not have to prove an express or formal agreement was made; rather, it merely has to show the coconspirators tacitly came to a mutual understanding. *Rutland*, 705 F.3d at 1250. "The existence of a conspiracy may be inferred from circumstantial evidence." *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). Interdependence means the coconspirators were united in a common goal or purpose. *Ailsworth*, 138 F.3d at 851. The trial

witness need not be a coconspirator, so long as the declarant is a coconspirator with the defendant against whom the statement is being offered. *See United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995).

When making a determination under Rule 801(d)(2)(E), the court "may consider both independent evidence and the statements themselves." *Rutland*, 705 F.3d at 1248. To satisfy Rule 801(d)(2)(E), the United States need show only that there is "some independent evidence linking the defendant to the conspiracy." *Martinez*, 825 F.2d at 1453 (relying on *Bourjaily v. United States*, 483 U.S. 171 (1987)). "[S]uch independent evidence may be sufficient even it is not 'substantial.'" *United States v. Owens*, 70 F.3d 1118, 1125 (10th Cir. 1995) (quoting *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)). Independent evidence is any "evidence other than the proffered [coconspirator] statements themselves." *Owens*, 70 F.3d at 1125 (quoting *Martinez*, 825 F.2d at 1451). "Testimony of a government agent regarding his interactions or conversations with coconspirators is adequate independent evidence." *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021) (citing *Owens*, 70 F.3d at 1125).

With regard to the third element under Rule 801(d)(2)(E), "in furtherance" means that the statements are "intended to promote the conspiratorial objectives." *Rutland*, 705 F.3d at 1252 (quoting *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007)). This requirement is meant "to strike a balance between the great need for conspirators statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017) (quoting *Perez*, 989 F.2d at 1578). Examples of statements the Tenth Circuit has held to be in furtherance of a conspiracy include

> statements explaining events of importance to the conspiracy, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, statements identifying a fellow coconspirator, and discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members.

*Ibid.* (internal quotation marks and citation omitted). Additionally, statements identifying members of a conspiracy, discussing particular roles of other coconspirators, and avoiding detection by law enforcement personnel are made "in furtherance of" a conspiracy. *Williamson*, 53 F.3d at 1520. "A coconspirator statement is made during the course of the conspiracy it if is made before the objectives of the conspiracy have either failed or been achieved." *Owens*, 70 F.3d at 1126 (quoting *Perez*, 989 F.2d at 1579).

Rule 801(d)(2)(E) requires the trial court to make findings on the record regarding the elements before admitting coconspirator's out of court statements. *See Perez*, 989 F.2d at 1581. The "strongly preferred order of proof" in determining the admissibility of an alleged coconspirator's statement is to first hold a hearing outside the presence of the jury to determine whether the party offering the statements has established the existence of a conspiracy by a preponderance of the evidence. *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994). At the hearing, the district court has discretion to consider "any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Owens*, 70 F.3d at 1124.

## II.     FACTUAL FINDINGS

In making its factual findings, the Court has considered the content of the alleged coconspirator statements themselves, as well as independent evidence of the existence of a conspiracy introduced at the *James* hearing. In making its determination, the Court heard the

testimony of United States Fish and Wildlife Service ("USFWS") Special Agent Zachary Oper, whom the Court finds credible.

### A. The Defendants' Roles and Business Operations

Imad, Iyad, Nedal, and Raed Aysheh are brothers.[2] Defendant Raed Aysheh managed a jewelry business called Golden Bear & Legacy, LLC, ("Golden Bear") organized in California. Govt.'s Ex. 13, 1, 3. Official California records list Golden Bear's address as 1406 Lincoln Avenue in Calistoga. *Id*. at 3. The business was incorporated in 2012. *Id*. at 1.

In May 2014, Defendant Imad Aysheh obtained permission from the Philippine government to manufacture and export jewelry using a business called "Imad's Jewelry" in the Philippines. Govt.'s Ex. 6, 10-11. The following September, Imad's Jewelry exported its first jewelry shipment from the Philippines to the United States. Govt.'s Ex. 26, 1. The shipment was received by I Jewelers Wholesale, Inc., ("IJW"), a business incorporated in California which shares the same Calistoga address as Golden Bear. Govt.'s Ex. 14, 1. Defendant Iyad Aysheh, is the president of IJW. *Ibid*. Iyad and Raed were authorized signatories on Golden Bear's bank account. Govt.'s Ex. 22.

From September 2014 to October 2015, Imad's Jewelry sent twenty-nine shipments worth $282,782 from the Philippines to IJW in California. Govt.'s Ex. 26 at 1-3. Nineteen of these shipments were made to the Calistoga address used by IJW and Golden Bear, while the remaining ten shipments were made to another address that IJW maintained in Lodi, California. *Id*. at 2-3. All but one shipment was imported under an import permit issued to IJW by the USFWS. Tr. 83:8-12; 84:1-4.

---

[2]     Because the Defendants share a common surname, the Court refers to them by their first names for ease of reference.

Records of bank wire transfers show that both Golden Bear and IJW wired money to Imad's Jewelry. Govt.'s Ex. 27. From March 2014 to July 2015, Golden Bear wired Imad's Jewelry $124,000. *Id*. at 1. The same records show that from September 2014 to October 2015, IJW also wired Imad's Jewelry $332,500.

Concerning Defendant Nedal Aysheh, evidence of record tends to suggest that he acted as exporter and domestic seller of jewelry. Import records from the Law Enforcement Management Information System ("LEMIS") listed Nedal as an exporter for three shipments in 2015 originating from the Philippines. Tr. at 63:22-24; 64:11-14; 70:2-25-3; Govt.'s Ex. 26 at 2. When cross-examined about the specific items of jewelry contained in the three shipments, the Government's testifying witness, Agent Oper, answered that he had access to the declaration numbers for the three shipments and accompanying invoice, which disclosed the quantity and price of the shipped items. Tr. at 115:21-25 – 116:1-2. This testimony tends to show that Nedal acted as an exporter, even though Agent Oper admitted that he was unaware of whether the jewelry in the three shipments was indelibly marked and that he was also unaware of where the specific pieces of jewelry "ended up." *Id*. at 116:10-13; 20-23.

Other evidence indicates that Nedal sold jewelry to U.S. retailers, including to his uncle's jewelry shop. An employee of the uncle's Gallup, New Mexico store told a federal grand jury that, to her knowledge, the uncle purchased imported rings from Nedal. Govt.'s Ex. 23, 3:11-22; 7:3-8.

For their part, Defendants tendered evidence that Nedal and a man named Calvin Begay entered into a 2012 contract for Nedal to form a company using Begay's name as a trade name and to employ Begay. Defs.' Ex. A, 196-1, 1. During the 42-month contract term, Begay was to "design and manufacture Indian jewelry," and grant Nedal's business the "right to use [Begay's]

6

designs and Begay's name and/or likeness in the marking and sale of said products as well as jewelry made by" Nedal's company. *Id.* at 1, 2. However, according to Agent Oper, the contract resulted in litigation. Tr. at 133:7-14.

### B. Statement Groups 1-3 – Agent Notes of Conversations Between Imad and Airport Agents

The Government disclosed various "statement groups" which it refers to as Statement Groups 1-3, Statement Group 4, and Statement Groups 6-7, 9, and 11.[3] As pertinent here, Statement Groups 1-3 are agents' notes of statements that Imad Aysheh made to Customs and Border Protection ("CBP") agents when Imad arrived and/or departed to and from the United States by air. Imad encountered CBP agents on Mary 23, 2014, July 27, 2014 and August 15, 2014. During each encounter CBP agents kept notes of the encounter and of Imad's statements made to agents.

### Group 1 - May 23, 2014 Encounter

On May 23, 2014, Imad was stopped in a U.S. airport on his way to the Philippines with about $7,050 on his person. Govt.'s Ex. 1, 2. He told agents that he owned a jewelry manufacturing business in the Philippines called Imad Jewelry because of available "cheap labor" in the Philippines. *Id.* at 4. He said that he stayed in the U.S. for five days with his brother Raed Aysheh, who lives in northern California. He told agents that he entered the U.S. with about $360 and withdrew roughly $6,690 from his personal accounts to finance his business

---

[3]      The Government's proffered statements have changed throughout its briefing. *See* Motion (proffering twelve statement groups); United States' Disclosure of Statements (ECF No. 189) (proffering ten statement groups); United States' *James* Hearing Memorandum (ECF No. 220) (proffering eight statement groups). The Court only rules on and adjudicates the proffered statements in the latter brief since it represents the Government's most recent proffer. More specifically, the Court only rules on the admissibility of Statement Groups 1-3; 4; 6-7, 9, and 11.

expenses in the Philippines. According to agents, Imad's carry-on bag "was completely filled with dozens of jewelry molds made of silicon and rubber." *Ibid*.

### Group 2 - July 27, 2014 Encounter

On July 27, 2014, Imad came back from his May 23 trip to the Philippines and arrived in San Francisco. Govt.'s Ex. 2, 4. He told agents that he owned a silver jewelry manufacturing business in the Philippines since March 2014 and provided agents the Philippine address of his business. He stated that he was in China trying to import materials to Cebu, Philippines. *Ibid*. And he also told them that his family had been in the jewelry business for 20 years and said that his father owned "Indian Gallery," that his brother Nedal owned "Nafim Jewelry" and that his brother Raed owned Golden Bear. *Id*. at 4-5. Philippine-made jewelry samples were in Imad's bags. *Id*. at 5.

### Group 3 - August 15, 2014 Encounter

On August 15, 2014 U.S. airport agents stopped Imad before he boarded a flight to the Philippines. Govt.'s Ex. 3, 6. Imad had $7,300 on his person. He told agents that he and his brother owned "I-Jewelry Wholesale" in the U.S. and that he owns Imad Jewelry in the Philippines. He said that he established Imad Jewelry in January 2014, but that the busines became operational only 45-days ago and that his family had been in the jewelry business for about 35 years. He mainly sold silver jewelry with inlays, he said, and obtained most of his jewelry resources from China and had products manufactured in the Philippines. He said that he stayed with his brother while in the U.S. *Ibid*.

### C. Statement Group 4 – January 2015 Text Messages Between Raed and Nedal

As part of this case, federal agents eventually executed a search warrant at the Golden Bear, Raed Aysheh's alleged jewelry business in Calistoga, California. Agents seized a

cellphone allegedly belonging to Raed and with the assigned number 505-870-3117 and a phone allegedly belonging to Nedal had the assigned number 505-515-8295. Govt.'s Ex. 4, 1. In a January 21, 2015 text conversation, Nedal texted Raed: "I need 5 hundreds from you I give merchandise when I get there." The following day, Nedal said, "please ray let me now when you deposit the money in imad account at Wells Fargo please," and "500 and you get merchandise." *Ibid*. After some ensuing text messages, Nedal texted Raed Imad's bank account number and Nedal asked Raed to verify that he received Imad's account number. *Id*. at 1-2. Raed asked Nedal to call him, to which Nedal responded "ok." *Id*. at 2. About ten minutes later, Nedal texted Raed an image of a piece of jewelry depicting Native American motifs. Tr. at 63:9-10. On cross-examination, Agent Oper admitted that he had never personally inspected the piece of jewelry that Nedal and Raed conversed about, and he stated that he did not know how the item was marketed or sold. *Id*. at 118:19-21; 119:10-16.

### D. February 2015 Interception Efforts

On two different occasions in February 2015, USFWS inspectors intercepted shipments of jewelry from Imad's Jewelry. Govt.'s Ex. 6a, 1-3. The shipping manifest on both shipments listed IJW as the importer and Imad's Jewelry as the exporter. *Ibid*. The jewelry contained in both shipments lacked a country-of-origin stamp denoting that the items were made in the Philippines. *Id*. at 2-3. According to testimony from USFWS Agent Oper, the intercepted shipments contained the initials "IJ" and the word "sterling." Tr. at 19:24-25; 22:6-7. The most expensive items contained in the shipments had a maximum value of $100. *Id*. at 19:12-14; 21:8-10. After photographing and covertly marking some of the jewelry, inspectors repackaged the shipments and sent them to the intended recipients. Govt.'s Ex. 6a at 2-3. "Aysheh" signed for the first intercepted package and "Ray" signed for the second one. *Ibid*.

Following these interceptions, USFWS nonetheless renewed IJW's import/export permit, even though the agency knew that the jewelry being exported was not marked with a country-of-origin stamp. Tr. at 84:5-8; 22-25 – 85:1.

### E. Statement Groups 6, 7, 9 and 11 – Statements by Raed and Iyad to Customers and to Undercover Agents

#### Group 6 – February 2015 Statements Between Raed and Special Agent Stanford

In February 2015, as part of an undercover operation, USFWS Special Agent Russell Stanford posed as a retail customer and negotiated the purchase of jewelry from Raed Aysheh in Raed's jewelry shop in Calistoga. Tr. at 35:1-10; 39-24:25 - 40:1-3, 40:10-11. Hidden audio and video recording worn on Stanford's person capture Raed telling Stanford that certain jewelry was "Navajo" made. Govt.'s Ex. 6(b), 10:21. At the conclusion of the conversation, Stanford purchased a bracelet and a bear pendant. Tr. at 40:7. The only indelible markings on the purchased items were the words "IJ" and "sterling," but not a country-of-origin stamp indicating the item was made in the Philippines. *Id*. at 40:19-25 – 41:1.

After the purchase, the items were photographed. According to Agent Oper's comparison of photographs from the undercover buy with photographs of jewelry from the February 2015 interceptions, the jewelry items were similar. *Id*. at 78:13-22; 79:12-16; Govt.'s Ex. 21.

#### Group 7 – Statements Involving Eric Shapira

As his investigation continued, Agent Stanford contacted one of Defendants' alleged victims, Eric Shapira, in March 2016. Govt.'s Ex. 7(a), 1. Stanford told Shapira that he was investigating Raed and Iyad and the Golden Bear shop in Calistoga. Stanford kept notes of his discussion with Shapira. According to Stanford's notes, Raed and Iyad represented jewelry to Shapira as "Native American made." *Ibid*.

In addition, Shapira shared with Stanford a prior text conversation between Shapira and a contact listed as "Ray."[4] *Id*. at 8. Apparently Shapira had lost many of the jewelry items in an unrelated burglary. *Id*. at 1. In March 2015, Shapira text messaged Raed about replacing the stolen items. *Id*. at 6-7. Shapira texted Raed that his wife "lost the Pueblo bracelet." *Id*. at 8. Raed responded by texting Shapira images of a bracelet, necklace and rings and offered to sell the replacement items to Shapira for $1,800. *Id*. at 9-13. The images depicted Native American motifs. Tr. at 57:1-2.

### Group 9 – Statements Between Raed and Special Agent Wagner

The Government produced a roughly 10-minute audio recording capturing a second undercover purchase between a different agent, Special Agent Wagner, and Raed Aysheh in Calistoga, California. Govt.'s Ex. 9(b). According to Agent Oper's testimony, the recording was produced on July 7, 2015. Tr. at 42:2. No accompanying video recording captured the encounter, *Id*. at 96:18-21, and thus the Court was unable to see what Raed represented as Native American made.  However, in response to the agent's question during the undercover buy about whether the jewelry was "Native American-made," Raed said "yes." Govt.'s Ex. 9(b) at 2:52-2:54.

### Group 11 – Iyad's Statements to Jewelry Store Owners Mohamad and Hamza Altheyab

In 2017, Special Agent Stanford spoke to Mohamad Altheyab, owner of Santa Fe Art Reflection. Govt.'s Ex. 11, 1. According to Stanford's interview notes, Mohamad and his son

---

[4]      Agent Oper did not state that "Ray" refers to Raed. However, the Court finds by a preponderance of the evidence that Ray is an informal name for Raed. The record contains a business card, signed "Ray," that Raed apparently gave to Shapira. Govt.'s Ex. 7(a) at 1, 5. The business card is for the Golden Bear, whose manager is listed as Raed in government documents. And the card also bears the same telephone number associated with Raed's cellphone found at the Golden Bear during the execution of a search warrant. Putting this evidence together, the Court finds that it is more likely than not that Ray is an informal name for Raed.

Hamza both ran Santa Fe jewelry stores, and both purchased jewelry from Iyad at the same time. *Id*. at 1-2. According to Stanford's notes, Iyad "described the jewelry as Native American the first time Altheyab and he did business." *Id*. at 1.[5]

### F. Gallup Indian Plaza Search

Law enforcement agents executed a search warrant at the Gallup Indian Plaza store. Tr. at 43:18-21. Agents found about 700 pieces of Indian-style jewelry with "IJ" marked on them. *Id*. at 44:1-17. Gallup Indian Plaza store employee Marci Joe told a federal grand jury that the store's owner and the Defendants' uncle, Mohamed Aysheh, purchased imported rings from Nedal. *Id*. at 45:3-16; 49:23-25 – 50:1-3. In a later interview with law enforcement officials, Mohamed told officials that he knew the jewelry he purchased "was Filipino made … when he bought it." Defs.' Ex. F, 1, ECF No. 224-1.

### G. The Indictment

Count 1 of the indictment implicates Defendants in a conspiracy from March 17, 2014 to on or about October 28, 2015 in New Mexico and elsewhere to present jewelry as Indian-made, to launder money, to introduce goods by means of false statements, to smuggle goods into the United States, to commit mail and wire fraud, and to engage in a monetary transaction in criminally derived property. Indictment, 2-4, ECF No. 2. Count 2 charges Iyad alone with a

---

[5]     Defendants claim that no evidence was presented about the date of Iyad's alleged statements to the Altheyabs. ECF No. 224 at 11. However, Stanford's report states that, according to Mohamad Altheyab, Iyad represented jewelry as Indian-made "in June or July of 2015." Govt.'s Ex. 11 at 2. The Court finds that the preponderance of the evidence shows that Iyad's alleged statement occurred in June or July of 2015.

violation of 18 U.S.C. § 1159 for knowingly displaying and offering for sale for $1,000 or more jewelry in a manner suggesting that the good was Indian produced. *Id*. at 15.[6]

## III.   CONCLUSIONS OF LAW

For the proffered statements to be admissible under Fed. R. Evid. 801(d)(2)(E), the Court must next find the following elements by a preponderance of the evidence: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of and in furtherance of the conspiracy.

### A. Existence of a Conspiracy

Based on all the evidence, the Court concludes that the Government has established by a preponderance of the evidence the existence of a conspiracy from March 17, 2014 to on or about October 28, 2015 in New Mexico and elsewhere to present jewelry as Indian-made, to launder money, to introduce goods by means of false statements, to smuggle goods into the United States, to commit mail and wire fraud, and to engage in a monetary transaction in criminally derived property. The evidence in the record includes, *inter alia*, Imad's statements to customs officials that he owned a jewelry manufacturing business called Imad's Jewelry using Filipino labor and carrying U.S. currency and jewelry molds; text messages between Raed and Nedal discussing payment of money for merchandise; bank transfer records linking some of the Defendants; documents showing the importation of jewelry into the United States by or between some of the Defendants; Raed's statement to Agent Stanford about the jewelry being "Navajo" and presentation of jewelry to Eric Shapira of items represented as Indian-made products. This

---

[6]     Count 3 is directed solely at Defendant Nael Ali who is no longer a party to this case because the Government dismissed the charges against him pursuant to a plea deal.  *See* ECF Nos. 99 and 102.

sample of evidence tends to show that the Defendants were united in a common goal or purpose to engage in the unlawful purposes described in the indictment.

### B. Defendants' Participation in the Conspiracy[7]

Sufficient evidence tying Imad to the conspiracy includes his registration of Imad's Jewelry in the Philippines and his statements to airport officials upon entering and leaving the country; his receipt of funds from codefendants Iyad and Raed; his numerous shipments of jewelry to IJW, a California business that Iyad was the president of; and USFWS' interceptions of shipments of jewelry lacking a country-of-origin stamp and listing Imad's Jewelry as the exporter on the manifest.

Sufficient evidence tying Iyad to the conspiracy includes his importation into the United States of Indian-style jewelry manufactured by Imad's Jewelry; his and his company's payments to Imad; and his shipment of Indian-style jewelry from Imad's Jewelry to stores in Lodi and Calistoga, California.

Sufficient evidence tying Raed to the conspiracy includes his and his company's payments to Imad and to Iyad; his text conversations from a phone seized from his California business in which Nedal asked him to deposit $500 into Imad's bank account; and his sale of jewelry to undercover agents and Eric Shapira and statements he made therein.

Sufficient evidence tying Nedal to the conspiracy includes LEMIS import records listing him as an exporter for three shipments in 2015 originating from the Philippines; evidence that

---

[7]     Much of the evidence linking Defendants to the conspiracy also qualifies as independent evidence, which refers to any "evidence other than the proffered [coconspirator] statements themselves." *Owens*, 70 F.3d at 1125. Because evidence of Defendants' participation in the conspiracy overlaps greatly with the independent evidence, the Court combines the two analyses together to avoid unnecessary duplication. The Court holds that the independent evidence shows that it is more likely than not that Defendants participated in the conspiracy. The Court has arrived at this conclusion without considering the coconspirator statements sought to be admitted.

Nedal sold jewelry to his uncle's jewelry shop, according to the shop employee's grand jury testimony; and evidence of Nedal and Raed's text message discussed above, including his transmission of images of Indian-style jewelry.

### C. Whether the Statements Were Made During the Course of and in Furtherance of the Conspiracy

### 1. Statement Groups 1-3 Are Not Admissible

The Court will not admit Imad's statements to airport officials contained in Statement Groups 1-3 because those statements were made to known authorities. Rule 801(d)(2)(E) does not require that the statement in question "be made by a coconspirator to a coconspirator." *U.S. v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995). But for out-of-court statements made to known authorities to be admissible under the rule, the statements must have been "intended to allow the conspiracy to continue, for example, by misleading law enforcers." *United States v. Alonzo*, 991 F.2d 1422, 1426 (8th Cir. 1993).

The Court concludes that there is insufficient evidence that Imad believed he was advancing the conspiracy when he spoke to airport agents. To be sure, his statements about owning a jewelry manufacturing business in the Philippines, using cheap labor, staying with his brother, discussing his family members' roles in the industry, etc., could arguably be viewed as "intended to allow the conspiracy to continue," since Imad needed to "freely enter and leave the country," as the Government asserts. ECF No. 222 at 20. However, the evidentiary record is insufficient to draw the inference that the statements themselves were intended to mislead agents or avoid raising their suspicions. Maybe Imad's responses to agents' questions could be seen as an attempt to portray his international trips in a legitimate light. However, the Government has not identified what portion of his statements are untruthful or would have hidden the alleged criminal objective or prevented its detection. Although it is a close call, the Court is ultimately

unconvinced that Imad's alleged statements are attributable to his codefendants as coconspirator statements. The Court therefore will not admit Statement Groups 1-3 against all Defendants under Rule 801(d)(2)(E).

In light of this ruling, the Court need not address or decide Defendants' claim that Imad's statements to airport agents are testimonial because no "ongoing emergency" was occurring when Imad spoke to agents and "the primary purpose of the interrogation" by the agents was "to establish or prove past facts potentially relevant to a later criminal prosecution." ECF No. 170 at 7. In Defendants' joint trial, the Government may present Imad's statement against him as a party-opponent statement under Rule 801(d)(2)(A), and Imad's codefendants may request an appropriate limiting instruction.

### 2. Statement Group 4 Is Admissible

Statement Group 4 is the alleged January 21, 2015 text conversation between Nedal and Raed. The Government's evidence provides circumstantial proof that Defendants Nedal and Raed were using the cell phones and participating in the conversations. The text messages show the two discussing the purchase of items ("500 and you get merchandise"), and updating each other on the status of financial transactions ("did u get [Imad's] account #"), and linking themselves to each other and to other members of the conspiracy ("please ray let me now when you deposit the money in imad account …"). The Court holds that the Government's circumstantial proof indicates that the "merchandise" under discussion was Indian-style jewelry when contextualized with Nedal's ensuing text of an image of a piece of Indian-style jewelry. The Court holds that the Government has shown by a preponderance of the evidence that the text messages in Statement Group 4 were made during and in furtherance of the conspiracy.

### 3. Statement Groups 6 and 9 Are Admissible

16

Statement Groups 6 and 9 are recordings from undercover purchases made by law enforcement agents. Generally speaking, "a government agent cannot be considered a part of a conspiracy[.]" *United States v. Ciresi*, 697 F.3d 19, 28 n.5 (1st Cir. 2012). However, "this rule has relevance only in situations where the conspiracy involves only [one] defendant and a government informer. In that situation there can be no conspiracy because it takes two to conspire...." *Id*. (citation and quotation marks omitted). In *Williamson,* the Tenth Circuit held that: "the fact that one party to a conversation is a government agent or informer does not of itself preclude the admission of statements by the other party—if he or she is a member of a conspiracy—under Rule 801(d)(2)(E)." *See also Ciresi*, 697 F.3d at 28 ("It is immaterial that the person to whom the statement is made is a government informant, … as long as the statement itself was made in furtherance of the common scheme.")

The Court finds that it is more likely than not that Raed's statements to undercover agents were made during and in furtherance of the conspiracy. Hidden audio and video recording capture Raed telling one agent that certain jewelry was Navajo-made, and answering "yes," in response to a second's agent's question about whether an item was "Native American-made." Govt.'s Ex. 9(b) at 2:52-2:54. Although the agents were not themselves members of the conspiracy, Raed's statements to them are admissible against Defendants under Rule 801(d)(2)(E) because Raed believed the agents were customers and made certain representations to induce a sale. Defendants argue that many of Raed's statements were made in response to Agent Stanford's attempt to "ensnare Mr. Aysheh into saying something incriminating." ECF No. 196 at 9. Although a jury may accept or reject Defendants' version of events, their argument is largely beyond the scope of the *James* issue. For purposes of ruling on the *James* motion, the

Court finds that the Government has shown by a preponderance of the evidence that Raed's statements in Statement Groups 6 and 9 were made during and in furtherance of the conspiracy.

The Government may show the jury Exhibits 6(b)-(d) and 9(b), which are either audio or video recordings of the purchases and post-purchase photographs of jewelry – the latter of which are not "statements" under Rule 801(a) – and are thus admissible. This ruling is consistent with the Government's proffer that it "intends to introduce [the recordings] in their entirety." ECF No. 220 at 21. However, the Court is uncertain about whether the Government wishes to admit Exhibits 6(a) or 9(a), which are the undercover agents' notes from the purchases. Tr. at 36:22-25 – 37:1-3. At this stage, the Court concludes that those exhibits are not admissible. Should the Government wish to move their admission into evidence, the Government must file an appropriate motion.

### 4. Statement Group 7 is Admissible

Statement Group 7 consists of Raed's statements to Eric Shapira. The Government's specific proffer is of "text messages from Raed captured in their entirety on pages 9 through 16." ECF No. 220 at 21.[8] The Government also states that it intends to call Shapira as a trial witness. The Court finds that the proffered statements at pages nine through sixteen were made during in and in furtherance of a conspiracy as will be admissible against the Defendants. Those texts consist of Raed texting Shapira images of jewelry allegedly depicting Native American motifs, offering to sell those items, and updating Shapira on the status of the order. The Court finds that the Government has shown by a preponderance of the evidence that the text messages in Statement Group 7 were made during and in furtherance of the conspiracy.

---

[8]     The Government did not paginate its various exhibits. The Court assumes that pages nine through sixteen consist of what the Government labels as USFWS_001842 – 87.

Defendants take issue with Shapira's statement to Stanford that he, Shapira, was "chagrined to find out that what I purchased may not have been Native American in origin." Govt's Ex. 7(a) at 1. They say that Stanford manufactured this accusation and therefore both Shapira and Sandford's credibility is at issue. *See* ECF No. 224 at 9. However, it does not appear that the Government intends to admit the specific statements by Shapira that Defendants find problematic. The Government's stated proffer is of "pages 9 through 16" of Exhibit 7, which does not include the allegedly problematic statements. The proffered documents instead consist of photographs, which are not Rule 801(a) statements, and a text conversation between Shapira and Raed. The latter is admissible against Raed as a party-opponent statement under Rule 801(d)(2)(A), and admissible against Raed's codefendants under Rule 801(d)(2)(E). The Court concludes that pages nine through sixteen of Exhibit 7 are admissible as coconspirator statements.

### 5. Statement Group 11 is Admissible

Statement Group 11 is Special Agent Stanford's notes from an interview with Mohamad Altheyab, a jewelry store owner in Santa Fe. The Government states that it "intends to introduce the statement that Iyad Aysheh described the jewelry as Native American the first time Altheyab and he did business." ECF No. 220 at 22. The Court finds, by a preponderance of the evidence, that this statement was made during and in furtherance of the conspiracy. The statement suggests that Iyad represented the jewelry as a Native American made to induce a sale. The Court concludes that the statement may therefore be attributable to Defendants under Rule 801(d)(2)(E).

## CONCLUSION

**IT IS THEREFORE ORDERED that** the Government's Notice of Intent to Offer Co-Conspirator Statements **(ECF No. 169)**, which the Court construes as a motion for pretrial rulings on the admissibility of evidence proffered under Fed. R. Evid. 801(d)(2)(E) is **GRANTED in part** and **DENIED in part**. Specifically, the Government's request to admit Statement Groups 4, 6-7, 9, and 11 under Rule 801(d)(2)(E) is **GRANTED**, subject to certain restrictions explained herein, while the Government's request to admit Statement Groups 1-3 under Rule 801(d)(2)(E) is **DENIED**.

**IT IS SO ORDERED**.

HONORABLE JUDITH C. HERRERA
Senior United States District Judge