## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**vs.**                                           **CR. No. 17-370 JCH**

**IMAD AYSHEH, *also known as*
IMAD MANASSRA, IYAD AYSHEH,
NEDAL AYSHEH, RAED AYSHEH and
NAEL ALI,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the *Joint Defense Motion to Reconsider Memorandum Opinion and Order Regarding the Admissibility of Statements* … [Doc. 230]. In that motion, Defendants Imad, Iyad, Nedal, and Raed Aysheh[1] jointly argue that the Court erred in ruling that certain statements will be admissible at trial under the hearsay exception for co-conspirator statements. *See* Memorandum Opinion and Order dated January 6, 2022 [Doc. 227]. The Government has filed a response [Doc. 234] and the Defendants have filed a reply [Doc. 238]. After reviewing the briefs, the law, and the facts, the Court concludes that the motion to reconsider should be denied, but the Court's previous opinion should be clarified as to certain issues. However, these clarifications do not undermine the validity of the Court's decision on co-conspirator statements—hence the denial of Defendants' motion.

---

[1] For clarity, the Court refers to them collectively as "Defendants" or "the Ayshehs," but refers to them individually by their first names.

## MOTIONS TO RECONSIDER

Although the Federal Rules of Criminal Procedure do not specifically provide for motions to reconsider, the Tenth Circuit has ruled that a district court may properly grant such a motion in a criminal case. *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014) (citation omitted) (applying law of the case grounds to motion to reconsider suppression ruling). The Tenth Circuit has provided that "[t]he law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) (quotation and citation marks omitted). Defendants rely on the tenet that "[w]hen law of the case doctrine applies, three circumstances generally warrant departure from the prior ruling: (1) new and different evidence; (2) intervening controlling authority; or (3) a clearly erroneous prior decision which would work a manifest injustice." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011). Here, Defendants argue that the Court's decision was clearly erroneous and would work a manifest injustice.

## DISCUSSION

Before admitting out-of-court statements into evidence under the coconspirator exception to the hearsay rule, a district court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. *See United States v. Morgan*, 748 F.3d 1024, 1036 (10th Cir. 2014). The elements of conspiracy are: "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy. . .  ((4) the alleged co-conspirators were interdependent," and (5) one of the co-

2

conspirators engaged in at least one overt act in furtherance of the conspiracy. *United States v. Leal*, 921 F.3d 951, 958-59 (10th Cir. 2019); Tenth Cir. Pattern Jury Inst. § 2.19 (2021). When considering the foregoing, the Court may consider hearsay because the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility. *United States v. Matlock*, 415 U.S. 164, 172-75 (1974).

Before addressing each of Defendants' seven arguments for reconsideration in the order they were raised, the Court will clarify its Memorandum Opinion and Order dated January 6, 2022.

## I.     Clarification of Prior Opinion

### A.     A Single Conspiracy with More Than One Object Crime

In its previous Memorandum Opinion and Order [Doc. 227 at 13], the Court stated that for purposes of the *James* hearing, the Government has provided sufficient evidence to establish that the Defendants were engaged in a single conspiracy with multiple object crimes from approximately March 17, 2014, to October 28, 2015. The Court hereby clarifies that for the purposes of the *James* hearing, the Government established Defendants' agreement was to import native-style jewelry made in the Philippines without an indelible marking of country of origin. Defendants further agreed to advertise and sell the jewelry in the United States under the misrepresentation that it was Indian-made. Thus, at the hearing the Government established that the conspiracy had two object crimes: to import the jewelry illegally in violation of the smuggling statute, 18 U.S.C. § 545, 19 C.F.R § 134.43(c)(2), and to violate the Indian Arts and Crafts Act ("IACA"), 18 U.S.C. § 1159.

B.      Some of the Out-of-Court Statements Are Not Hearsay

"A statement offered as evidence of the bare fact that it was said, rather than for its truth, is not hearsay." *United States v. Rodriguez-Lopez*, 565 F.3d, 312, 314 (6th Cir. 2009); *Starr v. Pearle Vision, Inc*., 54 F.3d 1548, 1555-56 (10th Cir. 1995). Similarly, "[a] statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc*., 573 F.3d 365, 379 (6th Cir. 2009). Finally, statements of a party opponent are not hearsay under Rule 801(d)(2)(A) of the Federal Rules of Evidence.

In this case, statement groups 6, 7, 9 and 11 are statements made by Defendants during the sale or attempted sale of their Indian-style jewelry. Groups 6 and 9 include recorded statements by Raed to an undercover agent during the purchase of Indian-style jewelry. In those statements, Raed indicated to the agent that certain jewelry was Navajo-made. Although these statements were made in furtherance of the conspiracy to manufacture Indian-style jewelry in the Philippines and sell it in the United States under the pretense that it was Native American made, they are not offered for their truth—that is, the government does not offer them to prove that the jewelry was in fact Navajo-made. Rather, they are offered merely for the fact that they were said. Further, they are the statements of a party opponent. As a result, the statements in groups 6 and 9 are not hearsay and therefore do not require a hearsay exception to be admitted into evidence.

The statements in Groups 7 and 11 require a more complex analysis because they consist of two "layers" of out of court statements—the original statements by Defendants to third parties, and then the third parties' statements relaying Defendants' original statements to a government investigator. More specifically, in Group 7 the first layer consists of photos and text messages sent by Raed to customer Eric Shapira regarding the sale of Indian-style jewelry that

4

he represented to be Native American-made. The second layer occurred when Shapira related Raed's statements to an investigator. Similarly, Group 11 consists of statements made by Iyad to two jewelry store owners describing his jewelry as Native American-made. Again, the second layer of out of court statements occurred when the store owners later repeated Iyad's statements to an investigator. As with the statements in groups 6 and 9, the first layer of statements in groups 7 and 11 are in furtherance of the conspiracy because ostensibly the statements were made to entice prospective customers by strongly suggesting or representing that certain pieces were Indian-made. However, the statements would be offered not for their truth but rather for the fact that they were said, and therefore they are not hearsay. *See United States v. Lewis*, 594 F.3d 1270, 1284 (10th Cir. 2010). Even if they were hearsay, they would be admissible as statements of a party opponent under Rule 801(d)(2)(A). Similarly, the Defendants' offers to sell certain items at certain prices are not hearsay, they are verbal acts whose significance is solely that they were made. *See United States v. Faulkner*, 439 F.3d 1221, 1226 (10th Cir. 2006).

On the other hand, the second layer of out of court statements—those made by Shapira and the store owners to government investigators—are offered for their truth and are therefore hearsay. If the government offers those statements at trial, they cannot be admitted in the absence of an applicable hearsay exception. Shapira and the store owners were not members of a conspiracy, nor did they make their out-of-court statements in furtherance of a conspiracy. Thus, those statements will be admitted at trial only if the Government can show that there is another applicable hearsay exception.

## II.  Mens Rea

A criminal conviction generally requires proof not only of a criminal act but also a guilty mind, or "mens rea." *Torres v. Lynch*, 578 U.S. 452, 467 (2016). A crime's mens rea is "specific

5

intent" when the prosecution must prove not only that the defendant voluntarily and intentionally committed the prohibited act but also intended to violate the law. *See Kawashima v. Holder*, 565 U.S. 478, 483 (2012). Conspiracy is a specific intent crime, so a defendant must possess "the intent to advance or further the unlawful object of the conspiracy." *United States v. Blair*, 54 F.3d 639, 642 (10th Cir. 1995). Further, conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself. *Ingram v. United States*, 360 U.S. 672, 678 (1959). However, the government need not show that a defendant knew exactly what law he was conspiring to violate. *Blair*, 54 F.3d at 643 (10th Cir. 1995) ("Specific intent crimes do not, as a rule, necessitate a showing the defendant intentionally violated a known legal duty. . . . The general conspiracy statute, 18 U.S.C. § 371, offers no textual support for the proposition that to be guilty of conspiracy a defendant in effect must have known that his conduct violated federal law."). One of the criminal objects of the conspiracy—violation of the smuggling statute, 18 U.S.C. § 545—is a general intent crime that requires proof of "knowingly" importing merchandise contrary to law, or receiving, buying, or selling any merchandise while "knowing" the merchandise to have been imported contrary to law. 18 U.S.C. § 545.  The other, violation of the Indian Arts and Crafts Act ("IACA"), 18 U.S.C. § 1159, by its plain language requires no particular level of intent as it does not contain words such as "knowingly" or "intentionally." Therefore, the Court infers that it too requires general intent.

The Court concludes that it did not err in concluding that the Government showed by a preponderance of the evidence that Defendants intended to perform the acts that form the basis for the conspiracy and therefore had the requisite intent.

### III.   Mutual Agreement to Violate the Law

Defendants argue that the Government has presented only evidence of a lawful business venture rather than Defendants' participation in a criminal conspiracy. Therefore, they contend that the Court's finding of a mutual agreement to violate the law was clearly erroneous. The Court disagrees, concluding that it did not clearly err when it found that the Government had proved the existence of a conspiracy to violate the law by a preponderance of the evidence, including that each of the defendants had the requisite intent. The Court pointed to evidence that Defendants cooperated in a business to bring foreign-made jewelry into the United States, and that the jewelry was not stamped with its country-of-origin—which is not only against the law, but also makes it easier to misrepresent the identity of the artist or craftsman to potential buyers. In its prior Memorandum Opinion and Order, the Court set forth the evidence presented at the *James* hearing showing the nature of the conspiracy and the Defendants' respective roles in that conspiracy.

To recap, the Government presented evidence that as early as March of 2014, Imad set up a jewelry manufacturing business called Imad's Jewelry in the Philippines. Then, starting in September of 2014, Imad's Jewelry began making and exporting jewelry to I Jeweler's Wholesale ("I Jewelers"), a California company with Iyad as a principal officer and Imad as a co-owner. Nedal assisted with the jewelry exports; in May and June of 2015, he was the contact person for sender of three shipments of jewelry from Imad's Jewelry in the Philippines to I Jewelers in California. Conversely, Iyad was the contact name for I Jewelers as the recipient of four shipments of jewelry sent by Imad's Jewelry in the Philippines in 2014 and 2015.

Imad's Jewelry's first nineteen shipments were sent to I Jewelers at an address in California it shared with a retail jewelry store, Golden Bear & Legacy ("Golden Bear"). Golden

Bear was owned by Raed, who sold Native American style jewelry at Golden Bear that came from Imad's Jewelry (including sales to an undercover agent). Several pieces of evidence support this inference. First, in February of 2015 jewelry shipped from Imad's Jewelry in the Philippines to I Jewelers in California was marked with the letters "IJ" but had no markings demonstrating that the Philippines was the country of origin. This is supported by (1) the similarities in the jewelry exported by Imad's Jewelry in February of 2015 and jewelry purchased by government agents at Golden Bear that same month, and (2) evidence of hundreds of thousands of dollars in wire transfers from both Golden Bear and I Jewelers to Imad's Jewelry. Next, Nedal facilitated the sale of Imad's Philippine-made jewelry to Raed. Text messages sent in January of 2015 show that Nedal prompted Raed to pay Imad for "merchandise" manufactured in the Philippines. In that exchange, Nedal sent Raed Imad's bank account number as well as photos of jewelry very similar to the jewelry seen in the February 2015 inspection of wares from Imad's Jewelry. This evidence is sufficient to show that Imad manufactured Native American-style jewelry in the Philippines and, with the help of Nedal, exported it to Iyad (via I Jewelers) and to Raed (via Golden Bear) in the United States. Furthermore, testimony from Marcy Joe shows that Nedal supplied jewelry manufactured by Imad's Jewelry (with all the pieces marked "IJ") to others in the United States, including the Defendants' uncle, Mohammed Aysheh, who owned a store called Gallup Indian Plaza. In October of 2015, federal agents seized over 700 pieces of Native American-style pieces of jewelry marked "IJ" at Gallup Indian Plaza. None of those items were marked with the country of origin; nor were the more than 100 pieces marked "IJ" that were seized from Golden Bear or the items inspected in February of 2015. The foregoing evidence is sufficient to show that all four Defendants knew the jewelry was manufactured in the Philippines; that each of them handled the jewelry at some point in the process of manufacturing,

transporting, paying for, and selling it (and therefore could see that it lacked the required marks); and that there were communications and transactions among them for the purpose of importing and selling it. Therefore, the evidence supports the reasonable inference that each of them knew that the jewelry was not Native American-made, that it was manufactured in the Philippines, and that they had a mutual agreement to bring it into the United States without an indelible country-of-origin mark in violation of 18 U.S.C. § 545 and 19 C.F.R § 134.43(c)(2).

Defendants argue that the Court erred in finding a conspiracy to violate the IACA because the Government did not present direct evidence of an agreement among the four brothers to offer, display, or sell the Philippine-manufactured jewelry in a manner that falsely suggested that it was Native American-made. The Government did produce evidence that on different occasions both Raed and Iyad misrepresented to customers that jewelry manufactured by Iyad in the Philippines was Native American made. It stands to reason that such misrepresentations were enhanced by the fact that the jewelry lacked any markings indicated that it had been made in the Philippines. Essentially, Defendants argue that despite the evidence of the close, interdependent business network the four Defendants created with the goal of importing jewelry manufactured in the Philippines and selling it in the United States, one cannot infer that the four defendants had an agreement that two of them would sell the jewelry in a manner that would violate the IACA. The Court disagrees. The Tenth Circuit has instructed that the existence of a conspiracy may be inferred from circumstantial evidence. *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). That is the case here. There may not be direct evidence of Nedal or Imad misrepresentation the craftsmanship of the jewelry, but such evidence is not necessary to infer that they agreed to be part of a scheme in which others did so. *See, e.g., United States v. Owens*, 70 F.3d 1118, 1127 (10th Cir. 1995).

**IV.     Identification of Conspiracies and Statements**

Defendants argue that the Court identified five alternative conspiracies and not only failed to state which defendant belonged to which conspiracy, but also failed to identify which conspiracy each statement furthered.

Aa explained above, the Court identified only a single conspiracy—in which all Defendants participated—with more than one object crime. It is well established that the Government may charge a single conspiracy with multiple object crimes. *See, e.g., United States v. Vaziri*, 164 F.3d 556, 566 (10th Cir. 1999); *United States v. Bell*, 154 F.3d 1205, 1209 (10th Cir. 1998); *United States v. Linn*, 31 F.3d 987, 990-91 (10th Cir. 1994). That is what the Government chose to do in this case—charge a single conspiracy with multiple object crimes. *See* Doc. 2 at 2-4.  At the hearing, the Government focused on proving two of the object crimes of the single conspiracy of which all Defendants were a part.

The Court has concluded that at the *James* hearing, the Government proved by a preponderance of the evidence the existence of a single conspiracy with two object crimes. The Court also concluded the Defendants' statements furthered that conspiracy. Doc. 227 at 16-19. At no point has the Court found the existence of multiple conspiracies, and therefore there is no need to match up individual defendants with separate conspiracies because all have been shown to be members of the same conspiracy.

The Defendants also challenge the evidence of a conspiracy as inadequate. Again, the Court disagrees. In both its prior opinion and again in this one, the Court set forth the evidence upon which it found the existence of the conspiracy. The fact that much of that evidence is circumstantial is of no moment because a conspiracy may be inferred from such evidence; direct evidence is not required. *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). In this

case, there was sufficient evidence of all Defendants working in concert to import and sell jewelry with no country of origin marking and to then falsely represent that jewelry as Native American to potential buyers.

## V.      Statement Group 4

Defendants argue that the Court erred in finding that the statements in Group 4 (text messages between Nedal and Raed discussing Native American-style jewelry manufactured by Imad in the Philippines as well as depositing funds into Imad's bank account) were made in furtherance of the conspiracy. According to Defendants, these were merely innocent statements, it was not illegal for Defendants to discuss such jewelry or bank deposits, and there is no evidence that any part of the discussion involved or furthered any illegal activity.

The Court is not persuaded by Defendants' argument. The statements cannot be viewed in a vacuum. Rather, when seen in context with the other evidence offered by the Government and discussed above, it becomes clear that the text messages (which include a photo of the style of jewelry Defendants were discussing) were made in furtherance of the conspiracy to bring Imad's Philippine-made jewelry into the United States without a country-of-origin mark and misrepresent it as Native American-made; in short, their statements show transactions that were the result of Defendants' coordination and planning of the object crimes. *United States v. Alcorta*, 853 F.3d 1123, 1141 & n.7 (10th Cir. 2017). That the statements themselves were not illegal is of no moment.

## VI.     Statement Groups 6 and 9

As explained above, the recorded statements in groups 6 and 9 are not offered for their truth. Therefore, they are not hearsay and do not require a hearsay exception to be admitted into evidence at trial.

The statements do, however, support the existence of a conspiracy among the Defendants, and they show Raed acting in furtherance of the conspiracy. For example, a factfinder could conclude that Raed misrepresented the origin of a manufactured bracelet as Navajo in order to induce a sale to an undercover agent. *See* Hearing Exs. 6b and 6c (audio and video recordings of Agent Stanford's encounter with Raed on February 20, 2015); Tr. at 39-41. It was evident from the video that when Raed indicated that the bracelet was Navajo, he was talking about it and not any other piece of jewelry. The fact that Raed also sold other, authentic Native American jewelry at Golden Bear does not alter the implications of Raed's statements about the bracelet as an attempt to induce a sale by misrepresenting the origin of the bracelet.

## VII.    Statement Group 7

As the Court has previously noted, the statements in Group 7 consist of two layers of hearsay. The first layer consists of photos and text messages sent by Raed to customer Eric Shapira regarding the sale of Indian-style jewelry that he represented to be Native American made. Because these are statements of a party opponent and because they are not offered for their truth, they are not hearsay.

Even if they were offered for their truth, the statements were made in furtherance of the conspiracy that the Court has found existed among Defendants. Defendants argue that there was no evidence that the jewelry sold to Shapira was inauthentic, and therefore there is nothing illegal about the communications in Group 7. However, this ignores the fact that the text messages in Group 7 included photos of the jewelry Raed was discussing with Shapira. That evidence shows that the jewelry was extremely similar in design and packaging to jewelry seized from an import shipment originating with Imad in the Philippines. The level of similarity was enough to create a reasonable inference that the jewelry did, in fact, originate from Imad's

12

Philippine manufacturing operation. The Court did not err in ruling that the statements in Group 7 should be admitted. However, as explained above, there are potentially two layers of out of court statements here. Therefore, if government agents testify relaying statements made to them by Shapira and the store owners, then those statements are offered for their truth and would be hearsay that cannot be admitted in the absence of an applicable hearsay exception.

## VIII.   Statement Group 11

Defendants argue that admission of statement group 11 would be "an egregious violation of the defendants' constitutional rights." However, Defendants do not elaborate on what constitutional rights would be violated or why, so the Court cannot address this argument. Next, the Defendants take issue with the layers of hearsay involved in the statement group. But as the Court has already noted, a defendant's own statements are not hearsay, and at trial the Government will have to demonstrate an applicable hearsay exception for any other layers of hearsay that may be present. In the meantime, as noted above and as Defendants recognize, the Court may consider hearsay evidence in a pretrial evidentiary hearing on the admissibility of evidence.

Finally, Defendants take issue with the reliability of statements by Mohamed Altheyab and Mohamed Aysheh. Defendants argue that both witnesses had motive to lie to agents in order to deflect blame away from themselves and toward Defendants. However, the Defendants can cross examine those witnesses at trial in order to probe their credibility. The Court did not clearly err in admitting these statements.

## IX.   Credibility Findings

Defendants challenge the credibility not only of witnesses Mohamed Altheyab and Mohamed Aysheh, but also that of Marci Joe and Agent Oper. Marci Joe testified that Mohamed

13

Aysheh purchased imported rings from Nedal. Defendants argue that Ms. Joe's testimony is unreliable because she never had contact with Nedal. However, that argument is undercut by evidence that Ms. Joe was able to identify Nedal from a photograph. Further, Ms. Joe's testimony is corroborated by evidence that the government confiscated hundreds of pieces of non-Native jewelry marked "IJ" from Mohamed Aysheh's store. Defendants also attack Ms. Joe's testimony on the grounds that she is not an expert in Native American jewelry. However, she does not need such expertise to testify as to her knowledge regarding Mohamed Aysheh's supplier.

The Court is not persuaded by Defendants' credibility challenges to Agent Oper. They contend that because he did not perform the original investigation but merely testified to the content of the reports written by investigators, his credibility is meaningless. However, as the fact finder for purposes of this motion, the Court is entitled to hear his testimony, assess his credibility, and rely his ability to accurately testify to that information. At the same time, Defendants attack Oper's credibility because he testified that the Defendants' contractual relationship with Native American artist Calvin Begay ended in litigation, when in fact Mr. Begay merely sent them a cease-and-desist letter *threatening* litigation. While Agent Oper's testimony on this point was not entirely correct, it does not undermine the basic fact that ultimately Defendants and Mr. Begay's business relationship was not amicable; that much is true, and Oper did not address the details of how that was resolved. Defendants contend that Oper also testified that all of the jewelry seized from Golden Bear was marked "IJ," when in fact some was not so marked because it was authentic Native American jewelry. However, as the Government correctly points out, Defendants mischaracterize Oper's testimony. He did not

testify as to the markings on all the jewelry; he merely testified that all of the approximately 100 pieces of seized jewelry that he personally examined were marked "IJ."

Finally, Defendants contend that the Government violated its own policies by allowing goods without country-of-origin markings to enter the United States, failing to inform Defendants that they needed such markings, and recording agents' interactions with Raed without his consent. However, it is unclear to the Court how these issues bear upon the question of whether the Government met its burden to show that Defendants were members of a conspiracy and that their statements were made in furtherance of such conspiracy.

Based upon all of the foregoing, the Court concludes that it did not commit clear error, and the motion to reconsider should be denied.

**IT IS THEREFORE ORDERED** that the *Joint Defense Motion to Reconsider Memorandum Opinion and Order Regarding the Admissibility of Statements* … [Doc. 230] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**